IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| NETSOCKET, INC., | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO.  2:22-CV-00172-JRG |
| | § | |
| CISCO SYSTEMS, INC., | § | |
| | § | |
| *Defendant*. | § | |
| | § | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is Plaintiff NetSocket, Inc.'s ("NetSocket") Motion to Compel Discovery (the "Motion to Compel"). (Dkt. No. 91.) In the Motion to Compel, NetSocket requests that Defendant Cisco Systems, Inc. ("Cisco") be compelled to (1) produce source code used in Cisco SD-WAN, Viptela SD-WAN, Cisco Meraki, StarOS, Cisco ACI/APIC, and Cisco DNA ("Requested Code"); and (2) identify which Cisco products or systems use the Requested Code per NetSocket's Interrogatory No. 6.

**I.      BACKGROUND**

NetSocket contends that Cisco infringes certain patents related to "Quality of Service" ("QOS") functionality. (Dkt. No. 91 at 1.) "QOS" generally defines the set of technologies in a computer network used to guarantee the network's ability to dependably run high-priority applications and traffic for networks that have limited capacity for data. (*Id.*) QOS can be used to assign the order in which packets are handled and the amount of bandwidth afforded to an application or traffic flow. (*Id.*)

In early 2023, Cisco alleged that NetSocket's infringement contentions were too broad and vague, and it began requesting that NetSocket specifically identify all infringing products. (*Id.* at 5.) According to Cisco, QOS is at the heart of all of Cisco's products, and simply accusing any Cisco product that implements QOS and "all like products" is tantamount to accusing all Cisco products. (*Id.*) NetSocket, however, argued that it could not provide more specific contentions until it received discovery related to Cisco QOS source code. (*Id.*) Specifically, NetSocket argued that it could not narrow the contentions or specify accused products because Cisco's proprietary software is accused in this case, and the information necessary to narrow the accused products was exclusively in Cisco's control. (*Id.*) Accordingly, NetSocket was forced to serve broad contentions mapping exemplary products based on what little information was publicly available.[1] (*Id.*)

Apparently, for months the parties were locked in this discovery loop, whereby Cisco refused to produce source code of its products without more specific infringement contentions narrowing the list of accused products and services, and NetSocket refused to serve more specific infringement contentions without Cisco producing source code that could lead to a more informed narrowing of the contentions. (*Id.*) In July 2023, as part of the parties' meet-and-confer efforts, NetSocket provided Cisco with a list of products for code that it was requesting. (Dkt. No. 91 at 5.) In that list, NetSocket identified Cisco SD-WAN, Viptela SD-WAN, Cisco Meraki, StarOS, Cisco ACI/APIC, and Cisco DNA and other products for which it requested source code. Around this time, the parties also requested a six-month extension of the Court's deadlines—including the trial setting—to allow more time for discovery.

In August 2023, the Court held a telephonic status conference concerning the parties' request to extend the trial setting by six months. (Dkt. No. 89.) At the Conference, the parties

---

[1] This dispute is an all to frequent example of the "chicken or egg" situation where each side says they can't move until the other party goes first.

revealed the discovery loop issues to the Court. (*Id.* at 5:2-19:4.) Having heard the parties' positions concerning the dispute, the Court stated:

> [T]he Plaintiff just better understand right now, I'm not going to make Cisco produce all the source code on every product Cisco makes, but Cisco needs to understand they're going to have to come across with source code as to the actual accused products so that there can be an informed narrowing of the case. We can't have an uninformed narrowing of the case where certain things are just chopped off just because they need to be chopped off.

(*Id.* at 12:4-11.)

The Court ordered the parties to rigorously meet and confer that evening, and the next day the parties informed the Court that they had reached an agreement on how to proceed with discovery. (Dkt. No. 90.) NetSocket created a "defined list" that specifically identified products that NetSocket contends practice the patents. (*Id.* at 5:14-21.) The list also included a description of the source code that NetSocket believed was needed to prosecute the case as defined by the accused products in the list. (*Id.*) Cisco represented that "with respect to a large and significant portion of that code, Cisco is in agreement to get that code produced, and the wheels are in motion to accomplish that process," but that "there is a component of that list that has not been completely resolved yet." (*Id.* at 5:22-6:5.) Counsel for Cisco clarified, "what I mean by that, Your Honor, is there is still some work left to be done, both from an investigation standpoint on behalf of Cisco and with respect to a meet and confer standpoint on behalf of both parties." (*Id.* at 6:5-8) Following this update and representation from the parties, the Court granted the six-month extension of the case. Three months later, NetSocket filed this Motion to Compel. (Dkt. No. 91.)

It is apparent from the Motion to Compel that the "Requested Code" (i.e., source code concerning Cisco SD-WAN, Viptela SD-WAN, Cisco Meraki, StarOS, Cisco ACI/APIC, and Cisco DNA) is the "component of that list that ha[d] not been completely resolved yet." That is, after the Court-ordered meet-and-confer, Cisco agreed to produce source code for the other

3

products, but not the Requested Code for Cisco's SD-WAN, Viptela SD-WAN, Cisco Meraki, StarOS, Cisco ACI/APIC, and Cisco DNA.

NetSocket now seeks to compel Cisco to (1) identify and produce the Requested Code; and (2) identify which Cisco products or systems use the Requested code per NetSocket's Interrogatory No. 6.

## II.   DISCUSSION

According to NetSocket, Cisco has refused to produce any source code related to QOS functionality other than source code for the specific products named in NetSocket's preliminary contentions. (*Id.* at 5.) According to NetSocket, "Cisco's position is that any Cisco code that is not specifically called out by name in the infringement contentions [is] not part of the case." (*Id.*) NetSocket argues that its preliminary contentions point to exemplary software products because Cisco's code is non-public and only Cisco knows the exact operation of the code and identity of the products that contain the accused functionality. (*Id.*) NetSocket contends that it has put Cisco on notice that QOS functionality—wherever that may exist in Cisco's products—is accused and that it is entitled to the Requested Code because the code for those products contain the accused QOS functionality. NetSocket argues that the Requested Code is implicated by the initial infringement contentions even if the initial contentions do not map out every single product for the Requested Code because NetSocket has accused "end-to-end [QOS]" has pointed to exemplary software and accused "all like products" as infringing.

Cisco argues that asking a networking company like Cisco to produce source code for all "products implementing QOS" is "the equivalent of asking Wells Fargo for discovery on 'money processing' products or asking Apple for all products with 'communication protocols.'" (Dkt. No. 107 at 1.) According to Cisco, QOS functionality is at the heart of every Cisco product, and NetSocket is simply fishing for source code of uncharted products. (*Id.* at 1-2.)

4

Cisco also contends that NetSocket has not been diligent in inspecting the source code that has been produced. Specifically, Cisco contends that it started producing source code around August 30, 2023, but NetSocket did not begin inspecting the code until October 25, 2023, and only after Cisco expressed concern about diligence. (*Id.* at 3.) By November 21, 2023, Cisco had produced over a terabyte of code—over 4 million files—including current version of all source code within its possession, custody, and control for products identified in the complaint and infringement contentions. (*Id.*)

Further, Cisco claims that the six "products" identified (Cisco SD-WAN, Viptela SD-WAN, Cisco Meraki, StarOS, Cisco ACI/APIC, and Cisco DNA) are actually "product categories." (*Id.*) Cisco argues that these product categories are not implicated in the infringement contentions because they relate to *software*-defined Wide Area Networks (SD-WANs), while the complaint and the contentions only chart traditional *hardware and router*-based Wide Area Networks (WANs).

Finally, Cisco argues that NetSocket's theory is contrary to law. Cisco contends that it is improper to broadly identify accused products with generic language about the "same or similar functionality." (*Id.*) (citing *Tivo Inc. v. Samsung Elecs. Co.*, No. 2:15-CV-1503-JRG, 2016 WL 5172008, at *3 (E.D. Tex. July 22, 2016)). Cisco argues that "NetSocket is not entitled to source code on uncharted products under P.R. 3-1." (Dkt. No. 107 at 6.)

Cisco's contention that NetSocket "is not entitled to source code on uncharted products" is precisely the issue addressed by the Court in the August 2023 telephonic conference. There, the Court acknowledged that the accusation of Cisco QOS functionality "within" or "as part of" source code production is, in fact, broad, and the Court explicitly instructed that case narrowing would be required. However, the Court emphasized that there should be *informed* case narrowing based on

5

the cooperation of the parties. (Dkt. No. 89) ("We can't have an uninformed narrowing of the case where certain things are just chopped off just because they need to be chopped off.")

The P.R. 3-1 charts in this case were made prior to the production of source code—in a case involving software patents and products. The contentions were assembled using publicly available documents. The Court agrees with NetSocket that "[o]nly Cisco knows the exact operation of the code and the identity of the products using that code," (*see* Dkt. No. 91 at 5), and the Court forewarned Cisco that production of code would be necessary to see an ***informed*** narrowing of the case. (Dkt. No. 89 at 12:4-11.) NetSocket identified six products (or, as Cisco contends, six product categories) for which it requests source code. The Court finds that this request is reasonably limited and that it seeks discoverable information.

Much of Cisco's response does not relate to the breadth or irrelevance of the request for production, but rather to the breadth of NetSocket's current infringement case. For example, Cisco argues that "NetSocket cannot accuse products that are not identified/charted in its infringement contentions." (Dkt. No. 107 at 7.) Cisco also relies on multiple cases where the issue before the court was whether or not to strike infringement contentions or whether or not to let new products into a case. (*Id.* at 6-7.) The Court has already acknowledged that NetSocket's infringement case is broad and needs to be significantly narrowed. Such is not a basis for withholding the limited request for production here. To the extent that Cisco is contending that NetSocket is accusing new products that were not previously in the case, that issue is not currently before the Court. The issue before the Court as to this Motion to Compel is whether Cisco should be required to produce the Requested Code, not whether NetSocket is improperly accusing new products. The Court finds that the Requested Code should be produced.

The Court allowed a six-month extension based on the representation of the parties that they would *cooperate* in narrowing this case. This Motion to Compel does not reflect well on the parties' efforts to date. NetSocket's contentions in this case are still too broad and make sweeping accusations of product categories such that it is difficult for Cisco to assess what products are accused.[2] At the same time, it is also apparent that Cisco has slowed the process of narrowing by refusing to produce the Requested Code. The Court explained that production of source code was a necessary step before there could be an informed narrowing of the case. However, it seems that the parties are hardly better off today than they were months ago when the Court ordered the parties to achieve reasonable case narrowing. The Court expects the parties to *cooperate* on narrowing the case going forward, and will hereafter consider an established failure to do so to be sanctionable conduct.

### III. CONCLUSION

For the reasons stated herein, the Court finds that the Motion to Compel should be and hereby is **GRANTED**. Accordingly, it is **ORDERED** that Cisco (1) produce the Requested Code, and (2) identify which Cisco products or systems use the Requested Code per NetSocket's Interrogatory No. 6.

**So ORDERED and SIGNED this 15th day of March, 2024.**

*/s/ Rodney Gilstrap*
RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE

---

[2] While NetSocket has made efforts to narrow in terms of asserted patents (*see* Dkt. Nos. 115 and 121), the Court has not seen the same effort with respect to narrowing and specifying the contentions as to the accused products in this case.